Good morning. May it please the Court. My name is Dan Siegel. I'm appearing for Mr. Blount this morning. I believe that there are two facts in the record of this case which clearly frame the situation before you. Number one is that for his more than 25 years as a Morgan Stanley Smith Barney employee, Mr. Blount was the only African American among 30-plus financial advisors in the firm's Santa Clara office. Secondly, on the very first occasion that he met him, Jim Nielsen, Mr. Blount's new supervisor, told him in his office that he should not make complaints to Human Resources or anyone else, should make complaints only to him, that if he didn't like it, he could seek alternative employment. And when Mr. Blount questioned him further, he I would like to point out, it might reflect a, how can I put it politely, hardline attitude, but I'm not sure that that makes out an employment discrimination case, because hard-ass bosses are hard-ass bosses, and there's nothing there that suggests that the discrimination was, or his attitude, had anything to do with your client's Well, Your Honor, you wouldn't expect a manager of a modern corporation to be much more explicit than that regarding his hostility to the fact that an African American employee is using the company's policies Wasn't there a reflex? Anything having to do with the African American element? Guy's a jerk. There are lots of jerks in that industry. And Mr. Blount is African American. And, too Is there any evidence that he didn't express the same hard-ass attitude to all the other brokers in the office? Your Honor, I'm sorry, but I'm going to have to push back on that. You know, we live in a society In fact, is there any evidence that he expressed any different attitude to anybody else in the office? That's a yes or no question. The answer is no. We may draw different inferences from that, but I'm questioning you as to whether there's any evidence There's one other I take it the answer is no No, the answer is yes Okay, what is it? That's what I'm asking for There's one other financial advisor of a minority race who worked in that office That was Mr. Graham, who was Hispanic Mr. Graham, in his declaration, reports consistent behavior by Mr. Nielsen in refusing to allow Mr. Graham to do the things that would be necessary to grow his business Mr. Graham quit because of that This is a case where there are a thousand cuts How that answers the question I posed to you. Do you recall what that question was? You asked me, Your Honor, and I suppose fair interpretation of your question is whether there are any explicit statements by Mr. Nielsen reflecting racial bias, and the answer to that question is no And in particular, I was asking, is there evidence of him treating other people differently? And what you just told me is that he treated somebody else the same Treated the same as he treated Mr. Blount Right There were I'm not saying that's the end of your case, but let's be clear, you're starting off by making the point that the supervisor's a jerk Okay That may be well and good, but that doesn't tell me he's discriminating He may be a jerk as to everybody He may be, but Morgan Stanley apparently thought he was an effective enough manager to maintain his employment for at least five years in that position And there is no doubt in the record that his treatment of Mr. Blount in every situation where he had an ability to assist Mr. Blount or not assist Mr. Blount in growing his income he always chose the opposite I think the record makes clear that a financial advisor at Morgan Stanley Smith Barney's success depends on a number of factors besides his or her own efforts And a lot of those factors have to do with management support Mr. Blount points out that his record of receiving accounts from departed financial advisors had a very negative impact on his income Mr. Blount reports that the level of staff support that he received had a very negative effect on his income particularly the withdrawal of a customer service administrator who was helpful to him and her being replaced by one who was not only not helpful to Mr. Blount from his perspective but was viewed as not helpful or effective by at least two of the three other financial advisors for whom Ms. Edens worked Perhaps though most tellingly, and I think this is important, was Mr. Nielsen's consistent rejection of persons whom Mr. Blount suggested be hired whom he could then partner with which again the record shows is one of the ways in which a financial advisor can improve his or her income Wasn't at least one of those persons actually hired? One person was hired initially and lasted for about three weeks, that's true But I think one of the sharpest factual interchanges in the case has to do with the hiring of Steve Parker who is a white gentleman, applied for work, receives a phone call from Mr. Nielsen, invited to come in for an interview In the course of the interview Mr. Nielsen says well you'll do fine here He even proposes a salary for Mr. Parker As Mr. Parker leaves the interview he says to Mr. Nielsen Oh by the way, I'm Jesse Blount's former brother-in-law A couple of weeks later when Mr. Parker calls to find out when it is that he should begin work Nielsen says oh I'm sorry I've changed my mind about hiring you It seems clear in these interchanges that if you are the right race or if you are rightly connected at MSSB Morgan Stanley is a pretty easy place to find work If you are connected to Jesse Blount it's almost impossible Even Mr. Benjamin who had been a former financial advisor at Morgan Stanley Smith Barney wanted to come back and disclose to Mr. Nielsen that when he, Mr. Benjamin, had previously been there he had worked with Mr. Blount Mr. Benjamin is then rejected And why is he rejected? He's rejected because of a supposed 10-year rule which prohibits the return of a former financial advisor who has been gone for less than 10 years Now no one else at Morgan Stanley Smith Barney knew anything about such a rule But it seemed that any pretext would be a sufficient grounds on Mr. Nielsen's part to reject Mr. Blount's efforts to work with people or to reject people who wanted to work with Mr. Blount I would like to point out that twice in the last several months this court has emphasized the relatively low burden that is required to overcome summary judgment in a case of this kind Both in France v. Johnson 795 F. 3rd 1170 which was issued in August And Negro v. Sears Roebuck & Company 784 F. 3rd 495 which was issued in April The court pointed out that in the face of evidence like the evidence in this case where the motivation of the actors becomes the key issue in determining whether there was discrimination or retaliation those are the types of issues that cannot be decided on the paper that need to be decided on the basis of what this court has called a searching inquiry Could I just come back to all those incidents The judge found that Morgan Stanley had proffered legitimate business reasons for each of them Parker for Perez I think the name of another was What is your evidence of pretext? Don't you have to show that those legitimate, proffered legitimate business reasons are really pretextual? What we have to do to demonstrate pretext is either to show that those reasons are not the actual reasons or that the reasons are really the bias of the decision maker We think we have established the bias of Mr. Nielsen towards Mr. Blount and that therefore the reasons that have been manufactured as justifications for each of those decisions can be called into question There's no doubt that an employer like Morgan Stanley can come up with a reason Well, we rejected Mr. Benjamin because of the 10-year rule Well, if there is no 10-year rule, there's no proof that Mr. Nielsen didn't actually believe there was a 10-year rule You don't have to do more than say we think it's pretext You need to be able to show something that would allow the court to conclude there's at least a factual dispute and that it might be pretext I'm struggling to understand what the evidence of pretext is other than the conclusion we think it's pretext Well, again, we think that Mr. Nielsen's initial behavior towards Mr. Blount demonstrated his attitude towards Mr. Blount and towards Mr. Blount's complaining about racial bias There's also evidence in the record that Ms. Liske was very skeptical about Mr. Blount and thought that Mr. Blount was a person who was prone to complain about racism Those are attitudes And I agree with Judge Clifton that it might just be because Mr. Nielsen's a jerk But how can a court decide on paper whether Mr. Nielsen's comments represent his tendency towards jerkiness or whether they tend to represent his racial biases? If you had evidence, for example, that he accepted suggestions of people to become employees of Morgan Stanley who had similar obstacles to their being hired but he accepted those suggestions and hired those people if the person suggesting them was white but he rejected them if it came from someone who was black That would be evidence, for example Well, Your Honor, I believe the fact that he accepted the employment application of Mr. Parker until he learned that Mr. Parker had an association with Mr. Blount is that sort of evidence The fact that he made up a rule which didn't exist to reject the reemployment of Mr. Benjamin who had been a successful financial advisor in the past is evidence of pretext The fact that he told Mr. Blount that he could no longer employ an intern to assist him in trade shows and didn't advise Mr. Blount that an option that he had would have been to pay that intern's salary himself in order to maintain her services All are susceptible of two interpretations But this is not simply speculation These are facts in the record which may or may not show bias And I just... I'm not sure exactly how to say this But, you know, racism and implicit bias are alive and well in a society where a justice of the Supreme Court feels empowered to comment about the supposed lack of intelligence of black scientists and mathematicians without thinking that that's a bigoted remark You cannot ignore the context in which these decisions have been made And I'd like to reserve the rest of my time, if I may You may Thank you Good morning, Your Honors My name is Daryl Landy from Morgan, Lewis & Bacchius We represent Mr. Nielsen and Morgan Stanley Smith Barney in this matter May it please the Court In this case, a very experienced trial judge, Judge Breyer, correctly applied the legal standards to the particular facts here There is nothing remarkable about those facts that would justify reversing Judge Breyer's decision Because the evidence here, contrary to Mr. Blount's counsel's characterizations, is a handful of trivial actions not racially motivated or retaliatory, adverse actions And I want to talk first about those allegedly adverse actions such as not taking Mr. Blount to lunch, a 25-year financial advisor or of changing his CSA, his Client Service Associate assignment, after he had complained about her and she had complained about him for at least a year and a half These actions did not materially affect Mr. Blount's compensation or the terms, conditions, or privileges of his employment That's the standard under Federal law for whether an action is an adverse action for a claim of discrimination The actions, based on the record, would not have discouraged a reasonable person under the circumstances from complaining about discrimination That's the standard under Federal law, as I'm sure you know, having watched arguments on Wednesday, for a claim of retaliation And these actions were not reasonably likely to adversely and materially affect Mr. Blount's job performance or opportunity for advancement in his career Under any of these tests that I just recited, for whether an action is adverse for purposes of a race discrimination or retaliation claim under Federal law or under California law, the evidence does not support reasonably concluding not just concluding, but reasonably concluding that any of the actions Mr. Blount addresses in this appeal were adverse Well, the nature of this business is that compensation flows directly from your accounts and how much you have One of the illustrations offered by Mr. Siegel had to do with the reassignment of accounts for departing brokers And if, in fact, Mr. Blount is disadvantaged not receiving those assignments, his compensation is affected Isn't that adverse employment activity? It could be, but one, that issue was not before this Court on appeal That's an issue that Judge Breyer decided on summary judgment based on the evidence that was presented in the record on summary judgment that was not presented in the papers on appeal in this case So I'd be happy to address what the evidence showed, but it's not in the record The evidence showed, essentially, that Mr. Blount was not treated any differently than any other financial advisor in the office with respect to account discrimination Something had to be in the record, because I know Judge Breyer talked about it Well, yes. He referenced it in his order, and he reached that Well, presumably he based that on something in the record Yes. There was evidence submitted that showed that the way that the account distribution system works at Morgan Stanley is at the time period in question was that accounts were distributed or redistributed to financial advisors in the office based on a formula A formula, by the way, that had been approved by Judge Henderson in the Northern District of California as part of a settlement of the Jaffe case that's referenced in appellant's papers And under that formula, based on a number of factors, each financial advisor is assigned what's called a power ranking And that's a combination of how many revenues they've generated in the prior month, how many assets they have under management, how many new accounts they bring in, those sorts of things All merit-based factors. Based on the number that's assigned as the power ranking for each particular month, then the accounts, when a financial advisor leaves and goes to a competitor so that their accounts are essentially in play, the accounts are distributed automatically by the system with some exceptions allowed for in the rules based on the power ranking, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 Depending on where Mr. Blount's power ranking was in a particular month, when a financial advisor left, the evidence showed he was treated no differently than any other financial advisor in the office On one or two circumstances, the financial advisors who departed had so few accounts, 10, 12 accounts, something like that, that were redistributed, they were relatively junior financial advisors, that they never got far enough down the list to Mr. Blount, whose power ranking at the time was something like 15th or 18th or whatever it was They didn't receive any redistributed accounts, but nor did anybody else who was far enough down the list So therefore, Judge Breyer reached the correct conclusion that there was no adverse action as to these account distributions Mr. Blount's counsel also talked about that Mr. Blount was the only African-American financial advisor in the Santa Clara office Actually, he was in the San Jose office, he's in the Wright County, but the evidence does not support that The evidence is that Mr. Nielsen hired, and there were other financial, excuse me, other African-American financial advisors in the office at the time And in fact, in the record is Mr. Blount's testimony that those people weren't treated disfavorably because they didn't complain, which seems to completely undermine his claim of discrimination When Mr. Blount first complained to Mr. Nielsen, let's make sure we understand the timeline on that and what the context was for that complaint Mr. Blount had complained in the spring or so of 2007, not or so, it was April or May of 2007, that his CSA had not been replaced quickly enough And he complained about that not to Mr. Nielsen or not to Ms. Lisk, but to his former manager, who was still the manager, Mr. Williams Then Mr. Williams left, Mr. Nielsen came in a couple months later after Mr. Blount's new sales assistant had been hired, client service associate, excuse me, Ms. Koch had been hired, and Mr. Blount came to Mr. Nielsen, not with a complaint of discrimination, not with a complaint of retaliation, but with a complaint that some of the sales leads that he had were missing and he thought another financial advisor had stolen them That's what the record is as to what Mr. Blount's complaint was to Mr. Nielsen, to which Mr. Nielsen allegedly said, don't go to HR, come to me, don't ever do that again Then, there are no allegedly adverse actions for the next two years. So, if Mr. Blount's claim is that somehow that Mr. Nielsen was demonstrating retaliatory motive or discriminatory intent or motive through that conduct, wouldn't you think that that's not a fair claim? That the situation would not be dormant for two years? And there's nothing that he complains about for the next two years. And then he starts complaining about, well, the first thing is, they didn't fix the situation with my CSA. Well, it wasn't for lack of trying, as the record reflects. Ms. Lisk met with Ms. Koch. Ms. Lisk is the supervisor of the CSAs. She met with Ms. Koch, she met with Mr. Blount, she heard their complaints, there are notes in the record to that effect. There's back and forth on that, again, for a year and a half where they cannot get the situation resolved to anybody's satisfaction, either Mr. Blount or Ms. Koch. And therefore, after conferring with Ms. Koch, they determine that the decision, the right decision to make for business reasons is, let's switch to CSAs. And let's not just switch Mr. Blount to anybody. The record reflects that Mr. Blount had worked with Ms. Edens before Ms. Koch was hired for several months, and he had not worked with Ms. Koch for several months. That he had nothing but good things to say about her. He praised her performance. And therefore, Ms. Edens was a logical person to whom to switch Mr. Blount. And then when you look at the level of support that he received based on the objective measure that Morgan Stanley used for assigning client service associates to financial advisors, there's a threshold number, $1.5 million in revenue, and that's to try to balance out the workload for the CSAs. So you have, you could have one financial advisor with $1.5 million in revenue, or you could have five. Ms. Edens initially had four, when the switch occurred in October 2010, had four financial advisors with $1.7 million in revenue, slightly above the threshold. That included Mr. Blount. But shortly after that, one of the financial advisors, Ms. Begott, switched away, and then later Mr. Graham left. So it got to the point where Ms. Edens was supporting two financial advisors, including Mr. Blount, with the lowest or the second lowest total revenues in the branch. Meaning she had, under that system, objectively more capacity to help than any other or most other financial, excuse me, CSAs in the branch. How is that discriminatory or unfair to Mr. Blount? He was not treated any differently than any financial advisor in the office. In fact, in many cases, he was treated more favorably. Let's talk about the example of the people that Mr. Nielsen supposedly rejected because of Mr. Blount's race. First, as Your Honor pointed out, the very first person that Mr. Blount suggested, Mr. Nielsen interviewed and hired, Ms. McCarthy. With the others, there's no evidence in the record, as you've pointed out, that other financial advisors had candidates come, first of all, let me take a step back. Mr. Blount, during this entire time period, had the ability, like all the other financial advisors in the office, to partner with incumbent Morgan Stanley financial advisors, meaning people who already worked there. There was no restriction on that. Just like every other financial advisor in the office, he could partner with FAs, he could partner with financial advisor trainees, and in fact, as the record reflects, he did do that in 2012 after Mr. Nielsen hired Ms. Barrows, and Mr. Nielsen approved the partnership. In any event, Mr. Blount, instead of choosing to partner with existing financial advisors, because in his words, it's in the record, it would not have been synergistic to do so, he asked Mr. Nielsen, please go out and hire somebody for me to partner with. Mr. Nielsen, contrary to what counsel said in terms of assisting Mr. Blount or not assisting Mr. Blount when it was his choice to do that, you'd think he would have said, no, I'm not going to do that. Instead, Mr. Nielsen said, okay, I'll interview the candidates that you provide me, and he did. He interviewed Ms. McCarthy, he offered her a job, he hired her, couldn't control the fact that she left, and then he interviewed several more candidates, acquaintances, that Mr. Blount presented to him. Mr. Benjamin, Mr. Due, Mr. Parker, Ms. Perez. I won't go into the details, the legitimate business reasons for declining all of those people, but I do want to say one thing about Mr. Parker, and that is that counsel omitted some significant facts that are in the record about what happened in that conversation with Mr. Parker between the time that the record says, at least according to Mr. Parker, Mr. Nielsen said, you'll do fine, and then Mr. Parker later said, by the way, Mr. Blount is my ex-brother-in-law. And that is, in between that time, both Mr. Parker and Mr. Nielsen testified to this. Mr. Nielsen said, I want you to talk to somebody else. I want you to talk to Mr. Gamblin, who is a financial advisor in this office. And the reason that Mr. Nielsen did that, and Mr. Parker acknowledged this, was to get a second opinion. The record on that is unrefuted, and that's why Judge Breyer reached the correct conclusion that these were completely legitimate business decisions by Mr. Blount. By the way, is there any evidence in the record, if we want to move beyond adverse actions to inferences, and one of the most significant inference that Mr. Blount needs you to draw to overturn Mr. ‑‑ excuse me, to overturn Judge Breyer in this case, is that he somehow suffered financially or somehow suffered in the terms and conditions of his employment because of not being able to go to a lunch or not having his CSA issues resolved or, like every other financial advisor in the office who had an intern, having his intern terminated after, excuse me, 10 months. And that is, it hasn't been linked to any decline in Mr. Blount's compensation. In fact, he can't point to a single client in the record. There's nothing in the record on this, and there isn't anything in the record. A single client that he lost because of any of these allegedly adverse actions, he can't point to a single client in the record. He can't point to a single dollar that he lost. Now, he says my income declined in 2010 and 2011. That's factually, that's correct. But he also said, and it did slightly, he also said my income declined as compared to my peers. And Mr. Blount had self‑selected nine other financial advisors to which to compare himself. And for purposes, excuse me, of this argument, we'll assume that that's a fair comparison. Whether those people actually were similar in a material way is a different issue. But let's just look at the numbers for those people for that time period. Several of the other financial advisors of those ten had their income decline at the same time, the same years that Mr. Blount did. And in fact, in 2012, when Mr. Blount's income increased, some of those financial advisors still had their income decreased. In 2010, which as you may recall, we were still in the midst of a recession, eight of the ten financial, and the financial markets were in pretty dire straits still, had their income declined. Every year, he was ranked fifth out of ten. So he never changed in comparison to the other nine financial advisors. Counsel, I'm curious, just taking a step back in this case, I understand there was at least a meeting with the mediator in this case in February of 2014? Correct. Considering how long Mr. Blount has worked for this company in its various iterations, I mean, it's, I'm a little surprised that we're here in this type of case, considering how long he's worked and the parties involved, but we are. I am curious if there has been any thought of going back to mediation on a case like this, or is it just both barrels and we're going? I'm not quite sure how to answer your question, Your Honor, but I would just say this. I'm not, I wouldn't be optimistic about the chances of success, and therefore, we're here. And with that, I see I'm out of time, so I would like to thank the Court and request that you affirm Judge Breyer's decision. Thank you. Thank you. Rebuttal. I would just like to respond briefly to some of the issues raised by counsel. The discussion of the relationship of Mr. Blount's income to those of his peers, not self-selected. There's no critique about the analysis that we did, except an argument, but not the facts. It's on page 22 of our opening brief. You know, Robert Graham, and I urge you to again review his declaration at pages 249 to 251 of the record. He testifies as to how Mr. Nielsen suggested that he was dumb. He also said that he was disadvantaged by the same change of CSAs that Mr. Blount complained of. And in fact, Mr. Graham made one step further. He said he felt so discouraged by Nielsen's treatment of him that he left the company when Ms. Koch was removed as his advisor. As to whether there are other African-American financial advisors, the record is without contradiction that Mr. Blount was the only African-American financial advisor. That's at page 264. Mr. Blount did complain about racial discrimination in the end of, excuse me, in mid-2006, the end of 2007. That's at pages 265 through 268 of the record. The fact that there were no complaints for two years after that is simply explained by the fact that Mr. Blount did not want to waive any complaints of discrimination predating March 2009 by the terms of the Jaffe settlement. Thank you. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted. The final case in the argument calendar for today is Hernandez v. Polanco Enterprises. Good morning, Your Honors. My name is Tanya Moore and I'm here representing Ms. Alma Clarissa Hernandez, the host of the hearing, who is a plaintiff and appellant in this case. I will try to reserve three minutes for rebuttal. May it please the court. In May of 2010, Ms. Hernandez could not enter defendant's door in her wheelchair without falling off the sidewalk in front of the entrance, because as stated in this court's decision, and I quote, the convenience store entrance had a noncompliant door landing in the form of a narrow slab of concrete. That's in the record on page 26. If the court would like to look at the photograph, it's attached in the record as page 141 of that condition. The issue presented here on appeal is rather straightforward. Should Ms. Hernandez be denied recovery provided under the Civil Rights Act damages for what happened that day, because defendant Polanco Enterprises, in response to her lawsuit and during the pendency of the lawsuit, widened the sidewalk. The district court answered... What's at stake here? I mean, what's the damage claim? The damage claim is statutory damages of $4,000. Is that all that is in dispute at this point? That is it, Your Honor, yes. And only as to the size of the landing that she encountered, correct? That was the only barrier that Ms. Hernandez has encountered personally. She has not encountered any other barriers because she could not enter. The court, the district court said yes, that if ADA violation is rendered moot, then the violation cannot be used to support the honor of claim for damages. In fact, the district court made this finding not once, but twice. The first time it was found in response to the motion for summary judgment. And when Ms. Hernandez attempted to bring the issue of damages in reserve and present it to the court at trial, the district court clarified its decision in the motion for summary judgment, basically stating that it was not a violation. Unambiguously, plaintiff may not seek money damages for encountering barriers that have been remediated. Counsel, I have a question for you. Your opposing counsel makes a lot of the fact that there was this stipulation to dismiss, and I have to say, it was very confusing trying to figure out what actually happened in this case. I understand the issue you've presented, and I have some questions for opposing counsel. There's the Grove case and the Iden case. The legal issue I understand, but I'd like just some clarification on kind of how we got there. There's the stipulation in this case, and who drafted the stipulation to dismiss? Was that a joint effort? Yes, it was. Because as I read that stipulation, and I'm referring to SDR 2, where do they use claims? Claims from 11N are dismissed. What is your reading, your understanding from the stipulation, what claims are being dismissed? Is it the various legal theories? Is it the size? Is it the slope? What are we talking about? The only barrier that has not been remediated at that time under 11N was the slope of the landing. That was not even a barrier that Ms. Hernandez has encountered, because obviously she could not use the landing. So by the time the court and the opposing counsel kind of generally referred to it as a landing barrier. However, the landing barrier is, has more than one barrier in it, and it could be the size and it could be the slope and it could be other issues. In terms of the size, the size was what the only barrier that Ms. Hernandez encountered. The only barrier that Ms. Hernandez complained about and the one that she personally encountered. And so for you to prevail before us, if I'm correct, you have to convince us that the district court granted summary judgment on the size portion of the landing, correct? Correct. The record is clear on this. The district court has addressed this issue, saying that the size of the landing is no longer an issue. And that the only, all the other, the rest of the barriers that Ms. Hernandez has not personally encountered have also been addressed in one way or the other. So the only remaining issue that survived the motion for summary judgment and was stipulated in this stipulation that Your Honor referred to was the slope of the landing. So I'm with you all the way. I see why you say that. Why does this stipulation simply say that we are dismissing 11N as it applies to the slope, the court granted summary judgment on 11N as to the size? Why, if it said that, then I don't think we would be in this kind of Alice in Wonderland situation that we're in right now as to what this all means. I wish it was more specific, and it wasn't. However, if the record is taken as a whole, and all the findings and the evidence that was presented in the stipulation, the statement of stipulated facts altogether, makes it clear that there was no longer an issue about the size of the landing, and the court referenced that as well in its findings. Now, as to the issue, and I don't want to gobble all my colleagues' time, but as to the Iden Grove issue is what I'll call it. It's about whether you can get unruh damages when the ADA issue has been remediated. Are you aware of any state law cases that would help us on this issue? Because I know we have some district court cases that you've cited in your papers. Any other authority you can have point to us to resolve that issue, which I understand that's the core issue for you in this case. So if I understand you correctly, you're saying if there is a state law case that addresses the issue if the damages could still be awarded based on the ADA violation, if it was subsequently remediated. Well, I would say that a very clear case on this would be Monson v. Del Taco. And Monson v. Del Taco, which is a Supreme Court case, dealt with a similar and very analogous facts and factual situation. Same thing happened there. The violations were mooted, the barriers were remediated, but nevertheless the court still found that absent the presently existing barriers existing at the time of the court's decision, the plaintiff still was entitled to the damages under Civil Rights Act. And in doing so, the court analyzed the application of the code sections, including California Civil Code Section 51F, which specifically makes a violation of the ADA a predicate violation for the California Civil Rights Act and does not apply to the ADA. It does not require, that's what the court found, there's no requirement of any intentional discrimination in that situation. So I think what is happening, the courts are looking at the injunctive relief being moot, but they're not using the same violation as a predicate for the damages claim under that code section. So your best case for State law would be the Monson case? Yes. I would also like to note that in this case, Polanco Enterprises never disputed specifically that Ms. Hernandez is entitled to the damages, because we believe that this determination was not supported by the state of the law. Both the district court and Polanco spent a lot of time on the issue of request for declaratory relief. Namely, Ms. Hernandez's request that the court make a determination, evidentiary determination, if the ADA violation as to the size of the landing entrance existed at the time Ms. Hernandez encountered it. Instead, so, but we are not appealing the issue of declaratory relief. We are only appealing district court determination that damages based on a mooted ADA claim are not available, or that Ms. Hernandez would have to show intentional discrimination. And we're not arguing that damages under California under a Civil Rights Act, if there is no ADA violation, require intentional discrimination and proof of intentional discrimination. However, here there was a violation of ADA. Simply because it was remediated doesn't mean that it was not an ADA violation at the time Ms. Hernandez encountered it. So let's say we agree with you. We say, look, there was an ADA violation. It was remediated, but there was one. And the district court concluded that the unruly action loses because there's been remediation. Let's say we disagree with that. What's the next step in this case? What do we do? Well, the only other factor and the only other prong that has to be decided in the case is whether Ms. Hernandez suffered difficulty, discomfort, and discrimination based on the ADA violation that she encountered. Because then, as a matter of law, she would be entitled to statutory damages of $4,000. But the district court did not address that issue, correct? The district court refused to address this issue. However, there is a stipulation in the record that Ms. Hernandez was prevented from entering the store because of the barrier. It's actually in the statute of limitations that states that Ms. Hernandez was prevented from entering the store because of the barrier. And it was undisputed by the defendants. It's a fact number 13 in the record on page 106. Fact 13, undisputed by the defendants, said during her May 21, 2010 visit to the gas station, Hernandez attempted to gain access to the convenience store to purchase something sweet, but was unable to get inside because there was insufficient maneuvering space on the next floor. She attempted to gain access to the convenience store by using a narrow sidewalk fronting the entrance for her to open the door and enter without her wheelchair falling off the sidewalk. And this was stipulated by the defendants, too. So if Ms. Hernandez was denied full access to the facility because of the ADA violation, it definitely meets the discomfort, embarrassment, or total denial of access. And if the Court does not have any further questions, I would like to save some time for the rebuttal. You may. Good morning, Your Honors. May it please the Court? Megan Childress, I represent the defendant in this case. I'm here to speak on behalf of Polanco Enterprises. I don't want to waste the Court's time kind of regurgitating what I've already presented in our opposing brief. I did want to address a couple issues that were raised in the reply brief, actually, for the first time in this appeal. One... I'm going to start with the first one, which is, is out of the case. Because of this Court's prior rulings, which have held that when a state law claim is entirely dependent on an ADA violation, that an ADA violation has to have been found, where the ADA barrier is removed, and therefore removed, the state law claim is also mooted. Well, you say based on this Court's decision. What decision? That's the... To be honest, I don't understand that. If the damage claim is based on an episode that occurred, how does fixing the problem later remove the fact that the damage had occurred? So, I'm interested in the citation you're about to offer me. Well, the Oliver case is the case that says that where an ADA, where a barrier is removed, the state law claim is also mooted. Then the ADA claim is moot. Well, sure, because the ADA doesn't have damages. It provides for injunctive relief, and there's no longer a need for injunctive relief. That doesn't speak to the state law claim for damages. Right, but you can't get your damages on your state law claim until you first find that there was a state law violation. And it appears that finding was made, and your client fixed the problem afterwards. That doesn't mean there hadn't been a violation at the time the barrier was encountered. Well, there doesn't, there wasn't a finding that there was a violation. But there could be. I mean, your client doesn't seem likely to contest it. Your client realized there was a problem and changed, removed the barrier. But that might be to be contested, but I'm not sure how fixing the problem later means the injury wasn't suffered in the first instance. And I don't think the Oliver case says that. It, it, there's not an ADA claim anymore. Granted, the ADA provides for injunctive relief, but the Unruh Act provides for damages, statutory damages. And why does that claim go away? Because that claim is dependent on there first being a finding of an ADA violation. And why can't there be a finding that there was an ADA violation at the time the barrier was encountered, albeit one that was later fixed? Because when the, let me point you to another case which was cited in our brief, where there's, where if the court finds that the ADA claim is mooted, the court need not determine whether there was an actual violation. That doesn't, that doesn't need to for ADA purposes, but can for State law damages claim purposes. I mean, the fact that a problem is fixed doesn't mean that it didn't exist at the time the barrier was encountered by plaintiff. So I don't understand the logic of saying that claim is moot. Give me the logic, separate from the cases, which I haven't found to say what you're saying they're saying. What's the logic in saying the barrier that she encountered, for which she's entitled to a claim for statutory damages, the fact that it was removed later, how does that change the fact that she encountered it when she tried to enter the store? The logic is that the ADA only provides for injunctive relief and not damages. And it's assumed that the legislature intended that the, that the purpose of the ADA is to, and these restrictions is to have businesses actually remediating. Then why is there a provision for statutory damages? Why isn't the UNRRA Act exactly parallel to the ADA in providing for injunctive relief but not statutory damages? The UNRRA Act is different. It does provide for statutory damages. Correct, Your Honor. So what, what suggests the legislature meant to say, okay, we're providing for statutory damages, but your liability goes away if you later fix the problem? Isn't that what you're now advocating? That is what I'm advocating because that has been, that's how these cases have been treated and that has been the law. What cases? Because the cases you've cited me don't speak to UNRRA Act damages. They speak to injunctive relief. And it's perfectly natural to say there's no longer a claim for injunctive relief if the problem's been fixed. But it doesn't explain why there's not a claim for statutory damages for having encountered the barrier in the first place. The way we get there is because the, if the state, if the ADA claim is found to be moot, the court does not need to find, there's no finding that there was a violation of the ADA. And in order to get damages under the state law, there has to be a violation of the ADA. So if that. The date that, that plaintiff tried to enter the store, are you arguing that your client was in compliance with the ADA? No, I, we concede that we are not in compliance with the ADA. Seems to me that's the basis for a finding that at that date the ADA was violated. Well, here, Your Honor, that, that finding could have been found. If we, had we gone to trial and had the plaintiff not dismissed her case, that finding could. And alternative explanation number two. That is that you acknowledge that if they'd gone to trial, if the plaintiff had been permitted to go to trial, and the court had concluded on that date there was an ADA violation, that plaintiff would be entitled to statutory damages. But, as suggested in your brief, plaintiff voluntarily dismissed that claim. Is that your position? Correct, Your Honor. I got to tell you, I have a hard time seeing that. Because the district court failed to identify this as a, as an issue for fact. Or rather, as an issue for trial. The trial at that point was limited to whether the fix was in compliance. Not whether the condition at the time, at the date the plaintiff tried to enter the store was in compliance. But the issue for trial, the sole issue for trial was whether there's 60 inch by 60 inch landing at the convenience store entrance. Whether the plaintiff was entitled to injunctive relief on that issue. Under the ADA, you're not, you're looking at the here and now and prospectively. So if the, since you're only entitled to injunctive relief, the issue is whether the court should order that the landing needs to be remediated. Or further remediated. And that's the only claim left for injunctive relief. But what about the damages claim for the barrier that was removed? Did the district court identify that as a claim for trial? That was, her state law claims based on paragraph 11N. Which included both the slope and the dimensions of the entrance landing were left for trial. So both her ADA claims and her damages claims under UNRU were left for trial. Well, I look at what the district court said and it seemed to speak in very broad terms. Saying that the claims that were mooted were no longer around. And claims that were mooted included the size of the landing. It seemed to me the slope issue was the only thing left. Can you point me to anything that suggests that the size of the landing issue was considered alive at that point? Sure. On summary judgment, plaintiff requested that the court include within the language of paragraph N, which was proper 60 inch by 60 inch landings were not provided. That that included the slope issue as well. That by even though the dimensions had been remediated, the landing was still not proper because the slope was off. So paragraph plaintiff, the plaintiff was the one that demanded and the court agreed that by proper landing that included the slope and the dimensions. Well, the slope issue was clearly still open. I agree with you there, but what tells us that the landing size issue was open? Because what I see the court saying in its pretrial order number one, when the plaintiff tried to bring back its argument that there had been a violation prior to remediation, the order says in its August 23 order, this court granted defendant's motion for summary judgment with respect to the claims based on 38 remediated barriers. In doing so, the court dismissed plaintiff's claims based on those barriers. This dismissal expressly applied to plaintiff's state and rather federal and state claims. Plaintiff's attempts to revive the state claims is unavailing. It seems to me that the district court is closing the door and saying that door is shut with regard to a state claim with regard to the remediated barriers. Do you read that differently? That the court, it was saying that. And the only barrier that the plaintiff could have received damages for was a barrier that she personally encountered, and that was the landing barrier. So the 38 other claims that had been, that the judge granted defendant summary judgment on were not the landing barrier. Isn't the problem, the problem seems to be that that statement in the pretrial order is actually inconsistent with the judge's actual finding in the August 23 order, which says explicitly 11N, alleging lack of, quote, proper 60 by 60 door landings, unquote, at the accessible entrance. The court denies both parties' motions for summary judgment. And then at the final sentence of that paragraph, with respect to the door landing, there's a tribal issue as to the slope of the landing. So you go to that. That's what you rely on, isn't it? And then you suggest that then you settled that or that was stipulated away in the stipulation. But the pretrial order is somewhat inconsistent with that because it seems to split 11N into two parts, the slope and the size of the opening. And that's what I think we're having a hard time dealing with. Can you point to me where it split in the pretrial order? She split the... Look at ER 3 and 4 and ER 6. When, what I understood the judge to be, the district court to be addressing in its pretrial order was what appeared to both me and I believe the district court to be an attempt by the plaintiff to try to receive statutory damages under UNRU for the remediate, all of the other remediated barriers that were still not left for trial at that time. And although I think the judges, the district court's best argument or best way of addressing this would have said you wouldn't be entitled to damages for those barriers anyway because you didn't personally encounter them. Well, there's no discussion of that in the order. But let's just focus on the one that was personally encountered. Where does the district court say that claim is gone? And what explanation is given for the district court saying that claim is gone? The district court never said that those claims are gone. The district court in the MSJ order said that... On ER 6, the order says plaintiff may not pursue any state or federal claim based on barriers that have been remediated, those claims having been dismissed. This is a barrier that's been remediated. Right, but the court hadn't found, with respect to the entrance landing barrier, which the court found included both the dimensions and the slope, the court denied both parties' summary judgments as to that barrier because the court said that I cannot find that this is a proper 60 inch by 60 inch landing because we have this issue regarding the slope. So both issues are still left for trial. The court did not, and it's clear from the court's MSJ order, that the paragraph 11N was still left for trial. But counsel, I hate to jump in, but ER 30, which is the very end of the district court's order on summary judgment, I'm looking at lines 10 and 11, the judge writes, with respect to the door landing, there is a tribal issue as to the slope of the landing, not as to size and slope, just slope. So how can we say size and slope are still alive when here she says just slope? But previously in the order, she had discussed that the entrance landing barrier, paragraph 11N, that allegation contained in the complaint addresses both the 60 inch landing and the slope. But that's in terms of notice to the parties. That's different as a summary judgment. When she's talking about 11N in that context, it's was Polanco on notice that these two types of claims are alive? And the answer was she found yes. Then, as I read this, she's then saying with respect to the door landing, the only thing left is the slope. Size has been remediated. Now, whether her legal analysis is that the Unruh Act was correct is something we have to decide. But I don't see how you get around that sentence on page 30 of the excerpt to record. I think that the court was saying in paragraph 3 of the order that the entire paragraph 11N is left for trial. And the reason is because there's still an issue regarding the slope. I note for the court that nowhere else in the order does the court grant summary judgment on the dimensions of the landing entrance to defendant. So the ruling either had to be granted or denied, and it was denied. There was no ruling made with respect to that. And I know you're almost out of time, but let's say you're right about that. Why would Ms. Hernandez agree in a joint stipulation to dismiss the only claim that we're here for today? I don't know. You think that they just totally blew it? I don't know if it was a mistake on their part. I don't know if it was an attempt to avoid going to trial and trying to get damages kind of through the back door by appealing this decision. I really don't know. When I saw it and they presented the stipulation to me and asked me to sign it, I was completely perplexed. If the court has no other questions, I will step down. Thank you. Thank you. Thank you, Your Honors, for your time. And Judge Owens stated that the discussion about 10A being included in paragraph 11N was for the purposes of the notice. And that's exactly what the court was analyzing when the court, when the district court decided that notice was provided, sufficient notice was provided. In terms of 11N, if you look at the complaint allegations, the paragraph 10 in 10A is the only element, the only paragraph in the complaint that states this is the barrier that Ms. Hernandez personally encountered. All the allegations in paragraph 11 refer to barriers that were subsequently discovered in the discovery addressed by the experts and the complaint was amended to include those. But nowhere in the complaint was ever, the plaintiff never alleged or argued. Is there anything in the record that suggests that your client's view was the damages claim was limited just to that one barrier? I mean, is this, I know you've said that in your briefing to this court. Was that ever clear before? Yes, Your Honor. I mean, if in the record on page 39, which is a pretrial statement that was prepared jointly by Ms. Hernandez and Polanco under damages, Hernandez states that she seeks also statutory minimum damages under California law for the barrier tissue which she alleges prevented her full and equal access to the gas station that caused her difficulty, discomfort and embarrassment, specifically that she could not enter the gas station convenience store because of the alleged barrier. There was no issue ever about the slope of, until after the remediation took place. And it was, what happened initially, there was a site inspection and the expert found additional barriers which were incorporated in the amended complaint under paragraph 11. After that happened, then Polanco addressed those violations and in the process, there was a new barrier created which was a slope of 11n. And that was the remaining issue that was dismissed. And with that, thank you, Your Honor. I'm out of time. Thank you for your time and aloha. We thank both counsel for your helpful arguments. The case just argued is submitted. That concludes the argument calendar. We're adjourned.
judges: Clifton, Owens, Smith